371 A.2d 899

**COMMONWEALTH of Pennsylvania**

v.

**Jerome WILLIE, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 13, 1976.

Decided March 31, 1977.

Van der Voort, J., dissented.

Edwin P. Smith, Philadelphia, for appellant.

Steven H. Goldblatt and Deborah E. Glass, Assistant District Attorneys, Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, Judge:

On June 14, 1974, appellant was arrested and charged with robbery, burglary, terroristic threats, possession of the instruments of crime, recklessly endangering another person, and carrying firearms without a license,[1] as the result of a robbery in a Philadelphia bar. Robert Gualtieri, the bartender, and Maria Roccia, the barmaid, testified that as they were closing the bar for the evening, the appellant entered the bar and demanded money at gunpoint, threatening to kill them if they did not comply. Gualtieri handed over a small box containing $2,500.00, and appellant fled from the bar. While the bartender called the police, Roccia ran from the bar an-

[1] Defendant's demurrer to burglary and carrying firearms was sustained.

nouncing the fact of the robbery, and Thomas Principato, who was outside the bar in the company of two friends, gave chase. Principato testified that he pursued appellant for three blocks, until he saw appellant enter a brown Cadillac and drive away. A short time later, a police officer who heard a radio bulletin pertaining to the robbery saw the appellant and a woman parked in a brown Cadillac less than three blocks from the bar, and stopped to question them. During this questioning, another police car arrived carrying Principato, who immediately identified appellant as the fleeing felon. The appellant was then transported to the bar in a police van, whereupon Gualtieri and Roccia attempted to identify him as the robber, but could not. Appellant was then taken to the police station and placed in a small observation room, where he was identified by Roccia when he spoke.[2]

After appellant was arraigned and indicted a suppression hearing was held, and the suppression court found probable cause for appellant's arrest, suppressed any identification by Roccia and Principato at the police station, and denied the motion to suppress the identifications made by Roccia and Principato in court and at the preliminary hearing.[3]

Following the appellant's third trial,[4] before Canuso, J., with a jury, he was found guilty of terroristic threats, possession of instrument of crime generally, recklessly endangering another person and robbery. Timely mo-

2. There was no further identification of appellant as the robber by Gualtieri until called on rebuttal at trial, to describe the clothing worn by the robber.

3. Maria Roccia appeared at the preliminary hearing and identified appellant as the robber to an assistant district attorney but did not testify. (N.T. S.H. pp. 46–48).

4. Defendant's first trial, without a jury, ended in a mistrial. His second trial, without a jury, ended in a finding of guilty on all counts, but defendant's post verdict motion for new trial was granted.

tions in arrest of judgment and for new trial were filed and denied, and defendant raised six issues on direct appeal to this court.

The record discloses that at defendant's trial, Maria Roccia stated during cross examination that she positively identified appellant as the robber when he was returned to the bar in a paddy wagon.

"Q. When the police opened the doors [to the police van] you say the light was not good enough for you to see the man's face in the wagon?

"A. He was in the back of the wagon.

"Q. You couldn't see his face well enough to identify him?

"A. Not very well.

"Q. Did the police then close the doors?

"A. Yes.

"Q. At that time or before the police closed the doors did you tell them it was the man?

"A. I said I was almost sure it was the man. I identified him. I did tell them he was the man that held me up.

"Q. While on the street outside the paddy wagon?

"A. Yes.

"Q. You are definitely certain you told them?

"A. Yes." Trial Transcript at pp. 31–32.

However, Maria Roccia testified otherwise at the suppression hearing, on the question of her identification of appellant in the paddy wagon. When asked on direct examination why she asked the police to require appellant to speak at police headquarters, she said:

"Well, in the paddy wagon I couldn't see very good and I told them I wasn't positive." S.H. Transcript at p. 14.

Again, on cross examination during the suppression hearing, Maria Roccia said she could not identify appellant in the wagon.

"Q. My question to you is, when you looked into the paddy wagon, at that time you said you couldn't be sure that the man in the paddy wagon was the man that held you up, isn't that correct?

"A. Right. I said I couldn't swear by it.

"Q. Did you tell the police at that time that you couldn't be sure because there wasn't enough light?

"A. Right." S.H. Transcript at p. 42.

In an apparent attempt to impeach Maria Roccia by use of a prior inconsistent statement, defense counsel began to question the witness about her memory. A conference ensued in chambers, where the following occurred:

"THE COURT: You are beginning to ask questions that are usually asked last. I take from what you started to say you were going to refer to what you considered to be some inconsistent testimony at a prior legal proceeding.

"Is that right?

"MR. SMITH: Yes.

"THE COURT: The proper way to do it is to show Mr. King what you are referring to and let's see if there is any inconsistency before you even ask questions about it.

"MR. SMITH: Well, I am just going to ask her if her recollection is better today than it was at that time.

"On Page 41 she said she couldn't swear at that time that was the man.

"THE COURT: Do you see that?

"MR. KING: Yes. I have a copy.

"MR. SMITH: I am not going to read the entire answer because the second portion refers to the South Detective Division.

"THE COURT: Do you approve of this?

"MR. KING: Yes.

"THE COURT: All right." Trial Transcript at pp. 33–34.

After another side-bar conference, defense counsel resumed his attempt to impeach Maria Roccia.

"Q. Again, referring to the same preliminary proceedings in Courtroom 636 on October 4, 1974, I am going to refer to Page 14 of the notes of testimony from that hearing. And this is referring to the same set of circumstances by the paddy wagon. The question asked by the district attorney of you was, and I quote: 'Why did you ask them to make him talk?'

Do you remember being asked that question?

"A. Yes.

"Q. Your answer was, and I quote: 'Well, in the paddy wagon I couldn't see very good and I told them I wasn't positive.'

Do you remember that answer?

"THE COURT: Why don't you read the whole answer?

"MR. SMITH: I think counsel and I would both agree that—

"THE COURT: I think you should read the whole answer.

"MR. SMITH: Can we see you at side-bar, your Honor?

"THE COURT: No. I think you should read the whole answer.

"I make an order that you read the complete answer.

"MR. SMITH: Okay, your Honor.

"BY MR. SMITH:

"A. '—and then when he was in the cubbyhole he was laying down with his hands on his head, and I told them, I said "please make him talk and make him lift

his head." They did, and I said, "That is the man." The same shirt, same everything. That was the man that put the gun to me.'

"MR. SMITH: May we see your Honor at side-bar?

"THE COURT: Ask the question.

"BY MR. SMITH:

"Q. Do you remember that answer?

"A. Yes, I do.

"MR. SMITH: May we see you at side-bar at this time?

"THE COURT: Yes." Trial Transcript at pp. 40–42.

We conclude that the trial judge's action in compelling defense counsel to refer to a suppressed identification made at police headquarters, contrary to agreement between counsel sanctioned by the trial judge, constituted reversible error warranting a new trial.

This is clearly not a case where defense counsel employed a precarious strategy which back-fired as in cases cited in the Commonwealth's brief. All parties including the judge agreed that there would be no reference to the suppressed identification. Defense counsel even sought to clarify the situation at side-bar when compelled to read the entire answer, but the judge refused.

In *Commonwealth v. Rogers*, 463 Pa. 399, 344 A.2d 892 (1975), our Supreme Court stated that

"Where evidence has been suppressed, no reference to the suppression hearing is permissible because such a reference would reveal to the jury or permit the jury to speculate about the existence of inculpatory evidence withheld from the jury by the suppression order." 463 Pa. at 405, 344 A.2d at 895.

While *Rogers* dealt with the possible exploitation of the defendant's refusal to make a statement and the defendant's suppression testimony, we think the rationale of *Rogers* applies in this case to prevent disclosure of a sup-

pressed identification by another witness. If no reference to the suppression hearing itself is permissible, then obviously any reference to suppressed evidence must be similarly proscribed. To hold otherwise in this case would be tantamount to nullification of the suppression hearing and permit the introduction of suppressed testimony at the whim of the trial judge in violation of the appellant's rights under Pa.R.Crim.P. 323.

The Commonwealth further contends that if it was error for the trial judge to require the whole answer to be read, it was harmless error beyond a reasonable doubt. We do not agree. The identification testimony at trial was not so overwhelming that we can eliminate the possibility that the suppressed identification reasonably may have contributed to the guilty verdict. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Commonwealth v. Harkins,* 459 Pa. 196, 328 A. 2d 156 (1974).

Appellant raises other allegations of error which we need not discuss because of our resolution of the above issue.

Judgments of sentence reversed. Case remanded for a new trial.

VAN der VOORT, J., dissents.